UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
--------------------------------------------------------

|  |  |  |
|---|---|---|
| TERESA BATUYONG, | : | CASE NO. 1:07-CV-944 |
| Plaintiff, | : | |
| vs. | : | OPINION & ORDER |
| | : | [Resolving Doc. No. 24] |
| SECRETARY OF DEPARTMENT OF DEFENSE, ET AL., | : | |
| Defendants. | : | |

--------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

Before this Court is a motion for summary judgment filed by Defendants Defense Finance and Accounting Service ("DFAS") and Robert Gates, Secretary of the Department of Defense. [Doc. 24.] Plaintiff Teresa Batuyong ("Batuyong") opposes the motion. [Doc. 25.] For the following reasons, the Court **GRANTS** the Defendants' motion for summary judgment.

**I. Background**

Plaintiff Teresa Batuyong was born in the Philippines on May 29, 1948. [Doc. 25-1.] She became a citizen of the United States in 1989. *Id.* In 1995, the Plaintiff began work as a secretary for the Defendant Defense Finance and Accounting Service in their Technical Services Organization ("TSO") in Cleveland, Ohio. *Id.*

In the spring of 2004, the Plaintiff's first- and second- level supervisors were Jeffrey King ("King") and Jay Griesser ("Griesser"). [Doc. 25 at 1.] Griesser was replaced by Jane Cironi ("Cironi) sometime before June 2004. *Id.* Although Plaintiff Batuyong generally received strong performance evaluations throughout her career, on at least two occasions, Cironi and King publicly criticized the Plaintiff. [Docs. 25-1 at 2; Doc. 25-2 at 2-3.] On May 26, 2004, King chastised the

Case No. 1:07-CV-944
Gwin, J.

Plaintiff for spending "too much time" working on the Asian/Pacific American Heritage Program, for which she served as a Special Emphasis Program Manager. [Doc. 25-1 at 4; Doc. 25-4 at 3.] This was not the first time that King and the Plaintiff had discussed her EEO activities.[1]

Plaintiff Batuyong sustained a non-work related knee injury and sought medical treatment in April 2004. [Doc. 25-1 at 3.] She underwent an MRI and scheduled surgery for June 4, 2004. *Id.* On May 27, 2004, the same day as the Asian/Pacific American Heritage Program was held at DFAS, the Plaintiff presented King with a request for 240 hours of advanced sick leave ("ASL") with respect to her knee surgery. [Doc. 25-1 at 3.] The request was accompanied by patient's notes. The Plaintiff knew these notes were not sufficient to obtain approval for her ASL request, so she informed King that she would submit appropriate medical documentation within the time allowed by the Code of Federal Regulations.[2] On June 4, 2004, the Plaintiff underwent surgery. On June 11, 2004, King recommended that the Plaintiff's request for advanced sick leave be approved, despite the fact that she lacked appropriate medical documentation. [Doc. 24-1 at 2; Doc. 25-7 at 6.] In compliance with DFAS policy, King forwarded the Plaintiff's request for ASL to the approving official, Jane Cironi. Cironi had never decided a request for ASL before, so she contacted DFAS's human resources department located in Indianapolis for advice. [Doc. 24-13 at 1-2.] HR specialist Jennifer Willis ("Willis") informed Cironi that the Plaintiff's ASL request could not be granted without "administratively acceptable medical documentation." [Doc. 24-1 at 3.]

---

[1] The Plaintiff states that, in early 2004, King denied her request to attend the National Congressional Training Conference for Federal Asian/Pacific employees and, on another date, denied the Plaintiff's paid attendance at the U.S.D. National Conference on Civil Rights. [Doc. 25-1 at 4.]

[2] The Plaintiff had accumulated sufficient leave time to cover her absence from work until June 17, 2004, but would need to use advanced sick leave thereafter.

Case No. 1:07-CV-944
Gwin, J.

On June 18, 2004, the Plaintiff received a note from her doctor, Dr. James Walker, and submitted this document to King. [Doc. 25-1 at 5.] Dr. Walker's note stated that the Plaintiff had undergone knee surgery on June 4, 2004 and that she could tentatively return to work on July 19, 2004. [Doc. 24-4.] That same day, King faxed a Department of Labor FMLA form to Plaintiff. *Id.*

On June 24, 2004, Cironi received this note and contacted Willis for help in deciding whether the information was acceptable. [Doc. 24-14 at 3-4.] Willis advised Cironi that the documentation was unacceptable because it did not include information explaining why the Plaintiff's knee surgery would long prevent her from performing her job, which consisted largely of sedentary and clerical activities, for six weeks. *Id.* Willis also consulted the "Medical Disability Advisor," a reference book that indicated that the recovery time for knee surgery was less than six weeks. *Id.*

On July 1, 2004, Cironi wrote a memorandum, pursuant to the advice received from Willis, denying the Plaintiff's request for ASL. [Doc. 24-5.]  Cironi asked the Plaintiff to submit additional information regarding the dates and times of her physical therapy and a medical certificate detailing how her post-surgery condition rendered her unable to work even with reasonable accommodation. *Id.* The memo informed the Plaintiff that she was to be provisionally granted Leave Without Pay ("LWOP") status, but that if DFAS did not receive appropriate medical evidence for her ASL request by July 9, 2004, then the absence might be classified as Absent Without Leave ("AWOL") and the Plaintiff could be subject to other disciplinary actions. *Id.*

On July 7, 2004, the Plaintiff received and submitted to the Defendants another note from Dr. Walker stating that she could return to work around July 19, 2004. [Doc. 24-6.] The note also included physical restrictions for the Plaintiff including instructions not to drive, bend, or lift. *Id.* Willis informed Cironi that this note was still unacceptable to verify Plaintiff Batuyong's ASL

Case No. 1:07-CV-944
Gwin, J.

request because it did not include information regarding her physical therapy or affected job duties, as required by the July 1, 2004 memo. [Doc. 24-14 at 5.] Cironi notified the Plaintiff of this decision on July 12, 2004, and also told the Plaintiff that her absent hours had been converted into LWOP and AWOL pursuant to the earlier memorandum.  *Id.*

On July 16, 2004, the Plaintiff received a third note from Dr. Walker in which he briefly stated that she was unable to perform her work duties. [Doc. 24-8.]  She also received a note from Dr. Faiman, her doctor for purposes of high blood pressure health problems, who stated that the Plaintiff's health was suffering due to stress from the work-related absence conflict.  [Doc. 24-9 at 2.]  After reviewing these materials, Willis told Cironi that the documentation was still administratively insufficient. [Doc. 24-14 at 5.] In late July 2004, the Plaintiff's union informed Cironi that they intended to file disparate treatment charges against the Defendants.  [Doc. 25 at 5.]

Apparently exhausted from the conflict over the leave, and despite the advice she received from Willis that Plaintiff Batuyong's ASL request still lacked proper medical documentation, Cironi decided to approve the Plaintiff's request on August 4, 2004.  [Doc. 24-11.]  Plaintiff Batuyong was paid for all of the leave she had taken since June 4, 2004; the AWOL and LWOP classifications were removed from the Plaintiff's time records; and the Plaintiff returned to work on August 9, 2004. [Doc. 24-14 at 5-6; Doc. 24-16 at 22.]

Three days after she returned to work, Cironi and King gave Plaintiff Batuyong her performance evaluation for the May 1, 2003 through April 30, 2004 evaluation period. [Doc. 24-12.] The evaluation, dated June 14, 2004, gave Plaintiff Batuyong a "Fully Successful" rating, the same rating that she had been given by her supervisors in the prior evaluation period. *Id.*

On March 30, 2007, the Plaintiff filed the present case against the Defendants. [Doc. 1.] The

Case No. 1:07-CV-944
Gwin, J.

Defendants filed a summary judgment motion on December 19, 2007. [Doc. 24.] On January 3, 2008,

the Plaintiff opposed this motion. [Doc. 25.]  The Defendants replied in support of their motion on

January 10, 2008. [Doc. 28.]

## II. Legal Standard

Summary judgment is appropriate where the evidence submitted shows "that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law." FED. R. CIV. P. 56(c).  The moving party has the initial burden of showing the absence of

a genuine issue of material fact as to an essential element of the non-moving party's case. *Waters*

*v. City of Morristown*, 242 F.3d 353, 358 (6th Cir. 2001).  A fact is material if its resolution will

affect the outcome of the lawsuit. *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 597 (6th Cir. 1998)

(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party meets its burden by "informing the district court of the basis for its motion,

and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence

of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting

Fed. R. Civ. P. 56(c)).  However, the moving party is under no "express or implied" duty to "support

its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.*

Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set

forth specific facts showing a triable issue. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 585-86 (1986).  It is not sufficient for the nonmoving party merely to show that there is

some existence of doubt as to the material facts. *Id.* at 586.  Nor can the nonmoving party "rest upon

the mere allegations or denials of the adverse party's pleading." FED. R. CIV. P. 56(e).

Case No. 1:07-CV-944
Gwin, J.

In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party. *National Enters., Inc. v. Smith*, 114 F.3d 561, 563 (6th Cir. 1997). "The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)); *see also Celotex*, 477 U.S. at 322. Ultimately the Court must decide "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 178 (6th Cir. 1996) (internal quotations omitted).

### III. Discussion

In her complaint, Plaintiff Batuyong raises four causes of action: (1) a hostile work environment claim, (2) a race discrimination claim, (3) a retaliation claim, and (4) an intentional infliction of emotional distress claim. Counts One through Three are all brought pursuant to Title VII of the Civil Rights Act of 1964, while Count Four arises either under Ohio tort law or the Federal Torts Claims Act ("FTCA"). [Doc. 1.] The Defendants seek summary judgment in their favor on all four claims. [Doc. 24.] The Court will address each claim in turn.

#### A. Race Discrimination Claim Under Title VII of the Civil Rights Act of 1964

A plaintiff can establish a prima facie disparate treatment case for race discrimination under Title VII by introducing direct evidence of discrimination or by using the *McDonnell-Douglas* paradigm. *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 802  (1973). *See also Kline v. Tennessee Valley Authority,* 128 F.3d 337, 348-49 (6th Cir. 1997). The *McDonnell-Douglas*

Case No. 1:07-CV-944
Gwin, J.

paradigm requires a plaintiff to show circumstantial evidence that a jury to could use to draw an

inference of discrimination. Specifically, the plaintiff bears the burden of establishing that she: (1)

is a member of a protected group, (2) was subject to an adverse employment action, (3) was qualified

for the position, and (4) she was treated differently than employees outside the protected class for

the same or similar conduct.  *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1246 (6th Cir.

1995) (citing *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir. 1992)).

Once the plaintiff establishes a prima facie case, a presumption arises that the defendant

unlawfully discriminated against the plaintiff.  The burden then shifts to the defendant to establish

legitimate non-discriminatory reasons for its actions. *Texas Dept. of Comm. Affairs v. Burdine,* 450

U.S. 248, 254-56 (1981). If the defendant can articulate legitimate non-discriminatory reasons, then

the burden shifts back to the employer to prove the stated reasons are pretext for discrimination.

*McDonnell-Douglas,* 411 U.S. at 804-5.  The ultimate burden of persuasion rests with the plaintiff.

*St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507 (1993).

In this case, the parties do not dispute that the Plaintiff has satisfied the first three elements

of the prima facie race discrimination case.  First, Plaintiff Batuyong is a member of a protected class

under Title VII because she is Filipino-American.  Second, the Plaintiff was qualified for her job and

has received positive job evaluations since she began working for DFAS in 1995.  Third, the Plaintiff

suffered an adverse employment action when she was initially denied advanced sick leave and placed

on Leave Without Pay (LWOP) and Absent Without Leave (AWOL) status, resulting in a temporary

reduction in pay, benefits, and health insurance.  The Defendants claim that Plaintiff Batuyong has

failed to prove the fourth element of her prima facie case, however, because she has not shown that

any DFAS employees outside of the protected class were treated more favorably with regard to

-7-

Case No. 1:07-CV-944
Gwin, J.

advanced sick leave requests by supervisors King or Cironi. [Doc. 24-1 at 9.]  In response, the

Plaintiff argues that she was "treated differently than *any* other employee, similarly situated or not,

who had requested ASL" and that no other  employee "was required to jump the hurdles created

specifically for Teresa by King/Cironi."[3/]  [Doc. 25 at 8-9.]

A similarly situated employee is one who has the same supervisor, was subject to the same

standards of conduct, and engaged in "nearly identical" conduct without differentiating or mitigating

circumstances that would distinguish their conduct or the employer's response.  *Mallory v. Noble*

*Corr. Inst.*, 45 Fed. Appx. 463, 471-72 (6th Cir. 2002); *Pierce v. Commonwealth Life Ins. Co.*, 40

F.3d 796, 802 (6th Cir. 1994).  The Sixth Circuit has instructed that courts "should not demand exact

correlation, but should instead seek relevant similarity."  *Perry v. McGinnis*, 209 F.3d 597, 601 (6th

Cir. 2000) (holding that employees were similarly situated when charged with the same duties and

had the same supervisor).  When a plaintiff is accused of violating company policies, such as the

claim here that the Plaintiff failed to submit proper documentation for her ASL request, the question

is whether the employer has a rational reason for treating the plaintiff differently.  When employees

engage in different conduct, they are not similarly situated because the employer would be rational

in disciplining them differently.  *See, e.g., Palmer v. Potter*, 97 Fed. Appx. 522, 524-25 (6th Cir.

2004); *Hardy v. Eastman Chem. Co.*, 50 Fed. Appx. 739, 743 (6th Cir. 2002).

This Court finds that the Plaintiff has failed to prove that she was treated differently than

similarly situated members outside of the protected class.  An individual similarly situated to

---

[3/] The Plaintiff alleges that she alone was required to: "complete a Department of Labor FMLA (Family Medical Leave Act) form; sign a waiver to allow a supervisor and/or a supervisor's chosen medical representative to speak directly with the employee's treating physician; and to make employee's treating physician review a position description of the employee in order to evaluate it and compare it with the employee's work restrictions." [Doc. 25 at 9.]

Case No. 1:07-CV-944
Gwin, J.

Plaintiff Batuyong would be a DFAS employee who was applied for ASL in the same relevant time period and failed to submit the proper medical documentation, yet whose request was still granted by Cironi or King.  The record indicates that no such person exists.

In support of her position, Plaintiff Batuyong relies on the affidavit of Theresa Gill, a computer analyst who has been employed at DFAS since 1985, in which she attests that she made an ASL request on August 14, 2007, her request was initially denied by her direct supervisor King, and then the request was officially granted on August 20, 2007. [Doc. 25-2 at 1-2.] Gill also says that, despite the initial rejection of her ASL request, she was never placed on AWOL status. *Id.*

This Court concludes, however, that Gill is not an employee similarly situated to the Plaintiff. First, the record does not indicate Gill's race and thus it is unclear whether she is a member of the protected class.  Assuming that Gill is not a member of the protected class, however, she does not provide sufficient comparison evidence for this case.  While Gill and Batuyong were both supervised by King, the Court notes that King actually recommended approving the Plaintiff's ASL request. [Doc. 24-2 at 2.] King, therefore, is not the DFAS supervisor responsible for the adverse employment action taken in this case.[4/]  In fact, King actually denied Gill's requests for ASL "several times," which cuts directly against Plaintiff's argument that the handling of her own ASL request was racially motivated.  Gill's initial ASL request was written and made in 2007, while Plaintiff's request was oral and made in 2004.  Gill's request was denied because of a concern that she would not be able to pay back the leave, while the Plaintiff's request was denied because she allegedly submitted

_____

[4/] Cironi, the approving official in this case,  had apparently never dealt with an ASL request before Batuyong's application, which renders the existence of similarly situated employees under her supervision more difficult to find. The Plaintiff, however, has not presented any evidence showing that Cironi has granted ASL leave to an employee with improper medical documentation since her interactions with Batuyong either.

Case No. 1:07-CV-944
Gwin, J.

improper documentation.  Gill and Batuyong displayed different conduct and applied for ASL leave in materially different situations; thus, they are not similarly situated employees.

Plaintiff Batuyong also alleges that Pat Kinsella, a white male employee at DFAS, was granted ASL leave for knee surgery in 2002.  The only evidence supporting this allegation, however, comes from Plaintiff Batuyong herself.  Gregory Harmon mentions the incident in his affidavit, but he lacks personal knowledge of the incident and relies solely on information provided to him by the Plaintiff.  [Doc. 25-3 at 2.]  Such evidence is inherently unreliable and, even if true, is too ill-defined to establish an adequate comparison for purposes of summary judgment.

Even when viewed in the light most favorable to the Plaintiff, her vague references to Kinsella and assorted other DFAS employees who received ASL are not sufficient to show that those individuals are similarly situated in all relevant respects because there is no information, for example, as to the length of time between their ASL requests and actual start of leave period, whether they included appropriate medical documentation with their applications for ASL, whether their requests were initially denied or provisionally granted, or as to the identity of their supervisors. *See Frazier v. USF Holland, Inc.,* 2007 WL 2913880, at \*4 (6th Cir. 2007) (finding that the plaintiff's "generalized and vague allegations that other non-minority casual employees were treated better than he was is not enough to make out a prima facie showing" for purposes of summary judgment).

Plaintiff Batuyong thus fails to present a prima facie case of race discrimination because she cannot satisfy the fourth element of the *McDonnell-Douglas* test.  The Court nevertheless goes on to consider whether, if the Plaintiff had satisfied the prima facie case, she could show that the Defendants' explanation is a pretext for discrimination. Here, the Defendants claim that they had

Case No. 1:07-CV-944
Gwin, J.

legitimate and nondiscriminatory business reasons for denying the Plaintiff's ASL request due to

insufficient medical documentation under 5 C.F.R. § 630.403(a).  Specifically, the Defendants say

that the Plaintiff failed to provide any medical paperwork prior to June 18, 2004, and submitted

insufficient documentation thereafter until her request was approved on August 4, 2004.

The burden then shifts back to Plaintiff Batuyong to demonstrate that the Defendants'

proffered explanation for their delay and initial denial of her ASL request was pretext for

discrimination. The Supreme Court says that plaintiffs can show pretext by demonstrating the

employer's proffered reasons are unworthy of belief, or by showing that a discriminatory motive

more likely motivated the employer's action. *Texas Dept. Comm. Affairs,* 450 U.S. at 256.

The Plaintiff claims that King and Cironi could have provisionally granted her ASL request

pending appropriate medical documentation, but failed to do so out of a personal dislike for her.  The

Plaintiff points to a few isolated incidents in which King criticized her for being away from her desk

when she was organizing EEO events, refused to pay for her travel to EEO conferences, or was

aware of previous grievances she had filed.  These incidents, according to the Plaintiff, establish a

racially discriminatory animus that motivated the Defendants' behavior.

This evidence fails to establish that the Defendants's proffered reasons for initially denying

the Plaintiffs' ASL request are pretextual.  Even if this Court were to assume that the Defendants

failed to follow their own internal procedures for evaluating advanced sick leave requests, this fact

alone is insufficient to establish pretext for race discrimination. *See White v. Columbus Metropolitan*

*Housing Authority,* 429 F.3d 232, 246 (6th Cir. 2005) (noting that "an employer's failure to follow

self-imposed regulations or procedures is generally insufficient to support a finding of pretext").

Further, the Plaintiff may not show pretext merely by pointing out that the Defendants made an

Case No. 1:07-CV-944
Gwin, J.

unwise business decision. *See Bahl v. Royal Indem. Co.*, 115 F.3d 1283, 1291 (7th Cir.1997) (stating

that "the inquiry is not whether the reason for the firing was a correct business judgment but whether

the decisionmakers honestly acted on that reason"). Even if this Court assumes that the Defendants

required Plaintiff Batuyong to submit more medical documentation for her ASL request than they

typically required of other employees, the Plaintiff must do more than show that this conduct was

potentially unfair; she must show that it was illegally motivated by race.

The record shows that Jeff King, the supervisor that Plaintiff Batuyong alleges was critical

of her EEO activities, actually recommended that her ASL request be granted. Jane Cironi, King's

supervisor who had never handled an ASL request before, reasonably relied on the advice of HR

specialist Willis. The record contains no evidence that Cironi acted on the basis of race in any of

her employment decisions or possessed any racially motivated animus. In fact, Cironi ultimately

recommended granting Plaintiff Batuyong's ASL request even though she was advised not to do so

by Willis due to Plaintiff's lack of medical documentation. Further, the record does not contain any

evidence that Willis even *knew* the Plaintiff's race because Willis worked in Indianapolis and only

corresponded about the Plaintiff's ASL request via telephone and email. [Doc. 24-14 at 3; Doc. 24-

13 at 2.] The Plaintiff bears the burden of showing pretext, and she has failed to do so in this case.

The Court therefore grants summary judgment in favor of the Defendants on the Plaintiff's

Title VII disparate treatment race discrimination claim.

### B. Hostile Work Environment Claim

The Defendants also allege that they are entitled to summary judgment on the Plaintiff's

hostile work environment claim. To establish a hostile work environment claim, a plaintiff must

show that (1) she is a member of a protected class, (2) she was subjected to unwanted harassment,

Case No. 1:07-CV-944
Gwin, J.

(3) the harassment was based on her membership in the protected class, (4) the harassment unreasonably interfered with her work performance, creating a hostile work environment, and (5) the employer is liable.  *See Clay v. UPS, Inc.,* 501 F.3d 695, 706 (6th Cir. 2007).

A hostile work environment claim will lie only where "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment."  *Harris v. Forklift Sys.* 510 U.S. 17, 21 (1993).  The plaintiff must show both that a reasonable person would find the environment objectively hostile and that the plaintiff personally found the conduct severe or pervasive. *Williams v. Gen. Motors Corp.,* 187 F.3d 553, 566-68 (6th Cir. 1999).  Offhand comments and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the "terms and conditions of employment." *Hafford v. Seidner,* 183 F.3d 506, 512-13 (6th Cir.1999).

The Defendants claim that they are entitled to summary judgment on Plaintiff Batuyong's hostile work environment claim because, even assuming the facts as alleged by the Plaintiff to be true, the harassment experienced by the Plaintiff is not sufficiently severe or pervasive.  This Court agrees. Plaintiff Batuyong complains of various incidents in which she was criticized by her supervisors, resulting in feelings of depression and humiliation.  While potentially upsetting, this conduct occurred in isolated incidents, thus failing to be pervasive, and was not so objectively severe that it actually changed the terms and condition of her employment. *Harris,* 510 U.S. at 21.

Further, the Plaintiff complains that the way in which her ASL requests were handled created a hostile work environment, resulting in physical and emotional injury during the period in which she was recovering from work. [Doc. 25-1 at 6-7 (noting that by the time she returned to work, "the damage was done")].  During that time, however, the Plaintiff was away from work and thus her

-13-

Case No. 1:07-CV-944
Gwin, J.

work performance was not affected.  Further, she received a high performance evaluation only days

after returning.  [Doc. 24-12.]  Plaintiff Batuyong makes some claim as to residual harassment that

she experienced upon return to the workplace in August 2004, but the allegations are vague and,

even if believed, do not amount to objectively severe or pervasive conduct in violation of Title VII.⁵⁄

### C. Retaliation Claim

Title VII prohibits retaliatory employment actions against employees who oppose or report

workplace practices that violate Title VII.  *See* 42 U.S.C. § 2000e-3(a).  A plaintiff must show that

(1) she engaged in a protected activity, (2) the employer knew about the protected activity, (3) the

employer took an adverse employment action, and (4) there was a causal connection between the

protected activity and the adverse action.  *Smith v. City of Salem,* 378 F.3d 566, 570 (6th Cir. 2004).

The Supreme Court has noted that Title VII "protects an individual not from all retaliation, but from

retaliation that produces an injury or harm. . . [A] plaintiff must show that a reasonable employee

would have found the challenged action materially adverse, 'which in this context means it well

might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"

*Burlington Northern & Santa Fe Ry. Co. v. White,* 126 S. Ct. 2405, 2414-15 (2006) (internal

citations omitted). This anti-retaliation provision does not protect against "those petty slights or

minor annoyances that often take place at work and that all employees experience." *Id.* at 2415.

Plaintiff Batuyong seems to allege that the adverse employment action taken with regard to

her ASL requests was in retaliation for previous labor grievances that she had filed. The Plaintiff

---

⁵⁄ Plaintiff, for example, says that "[a]fter my return to work, I received harassing treatment from Mr. King and Ms. Cironi.  Mr. King also tried to get me to sign an FMLA form for 'future illnesses.'" [Doc. 1.] Requiring an employee to fill out a medical form, even if not of the type usually required of employees, is not "sufficiently severe or pervasive" conduct to constitute a hostile work environment.

Case No. 1:07-CV-944
Gwin, J.

fails, however, to establish that those grievances were protected activity under Title VII.  The

Plaintiff's only other labor grievance relating to race discrimination, or any other protected activity

under Title VII, was dismissed as untimely when it was filed back in 1999 and involved two former

supervisors. [Doc. 25-14 at 1-2.]  The record does not indicate that any of the supervisors involved

in the instant case were even aware of that specific EEO grievance, let alone retaliated on that basis

in 2004.

Even assuming that the Plaintiff's prior labor grievances were protected activity of which the

Defendants knew, the Plaintiff has failed to show sufficient injury.  Plaintiff Batuyong certainly was

not dissuaded from filing the instant race discrimination lawsuit, and the evidence does not show that

a reasonable person would have considered the Defendants' delay in approving her ASL request

more egregious than any other bureaucratic annoyance that occurs all the time in the workplace.

Indeed, it appears that the Defendants actually acquiesced to the Plaintiff's ASL demands, rather

than retaliating, upon learning that she intended to file a race discrimination suit and provided her

with a "Fully Satisfactory" evaluation just three days after she returned to work. [Doc. 24-12.]

### D. Intentional Infliction of Emotional Distress Claim

The Defendants also say that they are entitled to summary judgment on the Plaintiff's

intentional infliction of emotional distress claim because the claim is preempted by the Federal

Employees Compensation Act ("FECA"), found at 5 U.S.C. § 8101, *et seq.*  The Plaintiff argues that

claims alleging employment discrimination and harassment are not covered by FECA.

The Federal Employees Compensation Act ("FECA") addresses work-related injuries of

federal employees. 5 U.S.C. § 8102(a). FECA covers claims "for the disability or death of an

employee resulting from personal injury sustained while in the performance of his duty." *Id.*

-15-

Case No. 1:07-CV-944
Gwin, J.

Generally, an injury occurs "in the performance of duty" if it arises out of and in the course of employment.  *Tarver v. United States,* 25 F.3d 900, 902 (10th Cir. 1994) (internal citation omitted). The FECA is the exclusive remedy against the United States for an injury within its coverage.  5 U.S.C. § 8116(c).  *See also Lockheed Aircraft Corp. v. United States,* 460 U.S. 190 (1983).

Intentional infliction of emotional distress claims raised by federal employees, regardless of whether they are brought under state tort law or the FTCA, fall within the purview of FECA and therefore are preempted by the statute.  *See Saltsman v. United States,* 104 F.3d 787, 790 (6th Cir. 1997); *Lockett v. Potter,* 2007 WL 496361, at *1-2 (N.D. Ohio 2007).  The fact that the Plaintiff's emotional distress claim arises in an employment discrimination context does not render the claim beyond FECA's coverage.  *See Figueroa v. U.S. Postal Service*, 422 F.Supp.2d 866, 878 (N.D. Ohio 2006) (noting that the "Sixth Circuit has made clear that FECA provides the *only* remedy for an employee disabled by work-related stress. . . Accordingly, mental distress FTCA claims predicated on a supervisor's workplace conduct are preempted by FECA") (internal citations omitted).

The Court therefore lacks subject matter jurisdiction to consider the Plaintiff's intentional infliction of emotional distress claim because FECA provides the exclusive remedy for her claim.

### IV. Conclusion

For the reasons stated above, the Court **GRANTS** the Defendants' motion for summary judgment as to all claims.

IT IS SO ORDERED.

Dated: February 4, 2008                                   s/          *James S. Gwin*
                                                          JAMES S. GWIN
                                                          UNITED STATES DISTRICT JUDGE